In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00052-CR

SHANNON RENDELL HORACE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 435th District Court
Montgomery County, Texas
Trial Cause No. 22-02-01647-CR

## MEMORANDUM OPINION

Appellant Shannon Rendell Horace appeals his conviction for possession of a controlled substance with intent to deliver, a first-degree felony. *See* Tex. Health & Safety Code Ann. § 481.112. In his sole issue, Horace complains the trial court abused its discretion by denying his Motion to Suppress the evidence of a warrantless search and seizure because his temporary detention was unduly prolonged. We affirm the trial court's judgment.

# BACKGROUND

Horace moved to suppress evidence from a warrantless search and seizure that he alleged was obtained without probable cause or reasonable suspicion. Horace argued his prolonged detention involving the delay of a canine unit was unlawful and the evidence seized should be suppressed because the facts and circumstances of the stop were insufficient for the officer to reasonably suspect he was trafficking narcotics.

The trial court conducted a suppression hearing, during which Horace challenged his prolonged detention. Bruno Miauro testified he was a Trooper with the Texas Department of Public Safety when he stopped Horace for speeding in Montgomery County around 12:47 a.m. Miauro asked Horace for insurance information and observed the passenger looking for paperwork. Miauro told Horace he would give him a warning if everything checked out okay to reduce any anxiety and asked him to come back to his patrol car. Miauro observed that Horace's hand was shaking when he handed him his driver's license. Miauro testified that Horace reported his girlfriend, who was the passenger in the car, owned the vehicle, which had a Louisiana plate.

While waiting for the information to return on Horace's license, Miauro asked Horace about his trip, and Horace reported he was headed to Leesville, which was a few hours away. Horace explained he traveled from Louisiana to Houston to eat at

2

Pappadeaux, but it was closed when they got there, so he sat in a parking lot, visited with his brother, and headed back to Leesville because his girlfriend had to be at work. Miauro testified that Horace's story was difficult to follow, because someone making a long trip late at night to go to a specific restaurant would check the restaurant's hours. Miauro stated he suspected there was more going on when he observed Horace breathing harder and moving his hands a lot when he talked about his trip's purpose.

Miauro testified that when the check showed the vehicle was not registered to Horace's girlfriend, Horace stated it belonged to her stepdad. Miauro explained he had special training in narcotics interdiction and that it was common practice for someone trafficking drugs to use someone else's vehicle. Miauro testified that when he exited his patrol car to talk to Horace's girlfriend about the vehicle's insurance, Horace got out in front of him and headed toward the vehicle.

Miauro explained that was a huge, red flag, and he thought Horace could try to flee or that there could be a weapon or contraband in the vehicle. Miauro grabbed Horace and pulled him back next to the patrol car for safety reasons because Horace's behavior was abnormal and made Miauro very uncomfortable. Miauro explained that another red flag was that Horace said he was going to the vehicle to get a lighter or his cigarettes, but the video shows Horace had both on his person. Miauro testified that at that point, he had not confirmed that the vehicle was not

3

stolen, and he suspected that criminal activity was afoot and that something was not right. Miauro explained he called for a second unit, because he needed to complete the traffic stop and did not believe it was safe for him to leave Horace to talk with Horace's girlfriend. Miauro explained that he knew Horace was extremely nervous because when he patted Horace down for weapons, he felt Horace's chest pumping hard. Miauro was on the border between Montgomery and Liberty County, and it took backup about nineteen minutes to arrive.

Miauro proceeded to question Horace's girlfriend about the vehicle's insurance and the trip and to check the vehicle's VIN number. Miauro testified Horace's girlfriend reported they ate at the restaurant and did not talk to or see anyone, which completely contradicted Horace's story and raised Miauro's suspicions even more that criminal activity was taking place. Miauro asked Horace's girlfriend if he could search the vehicle, which he believed contained contraband, and after she denied consent, Miauro requested a canine unit to check for narcotics because he had reasonable suspicion. Miauro explained that when he requested the canine, twenty-six and one-half minutes into the stop, he had not completed the traffic stop because he had not issued the warning.

Miauro testified that it took about twelve minutes for the canine unit to arrive on scene. Miauro explained that after the canine positively alerted on the vehicle, he searched the vehicle and found two kilos of methamphetamine.

4

The trial court admitted and viewed Miauro's body camera video of the traffic stop, and the video supports Miauro's testimony about the stop. The video shows Miauro stopped Horace for speeding, obtained Horace's driver's license, and requested insurance information. After two minutes and twenty-five seconds, Miauro asked Horace to come back to the patrol car so he could see if everything checked out, and Horace told him it was his girlfriend's vehicle. After being in Miauro's patrol car for about two minutes, Horace told the story of traveling from Louisiana to Houston to eat at Pappadeaux, which Horace claimed was closed. After about three more minutes, Miauro and Horace exited the car so Miauro could ask Horace's girlfriend for insurance information, and Miauro had to stop Horace from walking back to the vehicle by pulling on Horace's arm. Miauro asked Horace to wait by the patrol car and he stayed with Horace to make sure he did not flee. Approximately a minute-and-a-half later, Miauro told Horace to stop putting his hands in his pockets to get cigarettes and a lighter, patted Horace down for weapons, and requested a second unit. Approximately twenty-five minutes after the initial stop, the second unit arrived, which allowed Miauro to talk with Horace's girlfriend about the vehicle's registration and insurance. When Horace's girlfriend provided contradictory information about the trip, Miauro asked for permission to search her vehicle. After she denied consent, Miauro requested a canine unit about twenty-six minutes after the stop, and the canine unit arrived about forty minutes after the stop

5

and positively alerted on the vehicle. Miauro searched the vehicle and found two kilos of methamphetamine.

The trial court denied Horace's Motion to Suppress and found the evidence was admissible. The trial court found that Horace's prolonged detention was justified because it occurred before Miauro completed the tasks associated with the stop, and during that valid detention, Miauro developed reasonable suspicion that Horace was engaged in criminal activity other than the traffic violation. The trial court found Miauro diligently pursued a means of investigation that was likely to quickly confirm or dispel his suspicions, which included requesting backup for safety reasons eight and a half minutes after initiating the stop and requesting a canine unit after consent for a search was denied twenty-five minutes into the stop. The trial court also found the time Miauro spent waiting on backup and the canine unit was not unreasonable under the circumstances.

Horace pleaded guilty to the first-degree felony offense of possession of a controlled substance with intent to deliver, and the trial court accepted Horace's plea, found him guilty and assessed his punishment at twelve years of confinement.

## ANALYSIS

In his sole issue, Horace complains the trial court abused its discretion by denying his Motion to Suppress because there was no separate justification beyond the purpose of the original stop for Miauro to prolong his detention and wait for a

canine unit to dispel his suspicions that criminal activity was afoot. Specifically, Horace argues his temporary detention was unduly prolonged by Miauro's lack of diligence in requesting the canine unit after he formed additional reasonable suspicion during the stop.

"We review a trial court's ruling on a motion to suppress using a bifurcated standard for an abuse of discretion." *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023). "We defer to a trial court's findings of fact that are supported by the record." *Id.* We review de novo legal questions and mixed questions that do not turn on credibility and demeanor, such as the facts of a case that would establish probable cause. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, and the trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

Under the Fourth Amendment, a person can be detained no longer than is necessary to effectuate the purpose of a valid traffic stop. *See Florida v. Royer*, 460 U.S. 491, 500 (1983). In investigating a traffic violation, an officer is to use the least intrusive means reasonably available to the officer to verify or dispel the suspicion that led to the stop. *Id.* Thus, the reasonableness of the duration of a stop does not

7

depend solely on the time needed to determine whether a traffic offense occurred. *See Love v. State*, 252 S.W.3d 684, 687 (Tex. App.—Texarkana 2008, pet. ref'd).

If an officer has a reasonable basis for suspecting a person committed a traffic offense, he may legally initiate a traffic stop. *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992); *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd) (citation omitted). "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). A routine traffic stop is analogous to a *Terry* stop, during which "the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop . . . and attend to related safety concerns[.]" *Id.* (internal citations omitted). Because addressing the traffic violation is the purpose of the traffic stop, authority for the seizure ends when the tasks tied to the traffic violation are completed or reasonably should have been completed. *Id.*

A traffic stop becomes unlawful when it is prolonged beyond the time reasonably required to complete the mission of the traffic stop, which includes ordinary inquiries incident to the stop. *Id.* at 354-55. Typical inquiries include, among other things, checking the driver's license, inspecting the vehicle's proof of insurance, and requesting information about the ownership of the vehicle, the driver's destination, and purpose of the trip. *Id.* at 355; *Veal v. State*, 28 S.W.3d 832,

8

835 (Tex. App.—Beaumont 2000, pet. ref'd). An officer may conduct a computer verification of the person's license and insurance, and the traffic-stop investigation is not complete until the check is complete, and the officer confirms that the person has a valid license and insurance. *Kothe v. State*, 152 S.W.3d 54, 63-64 (Tex. Crim. App. 2004); *see Strauss v. State*, 121 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, pet. ref'd). Because traffic stops can be dangerous, an officer may need to take certain safety precautions to complete his mission safely, including on-scene investigations into other crimes. *See Kothe*, 152 S.W.3d at 63-64.

In gathering the types of information typically associated with a traffic stop, an objectively reasonable officer may form a reasonable suspicion that some crime other than a traffic violation is afoot. *United States v. Sharpe*, 470 U.S. 675, 685-86 (1985). If so, the focus in determining whether the detention is prolonged shifts to evaluating whether those suspicions were objectively reasonable, and whether they were investigated in a manner designed to quickly confirm or dispel them. *Belcher v. State*, 244 S.W.3d 531, 539 (Tex. App.—Fort Worth 2007, no pet.). In evaluating a complaint about an allegedly prolonged detention, courts are allowed to consider whether legitimate law enforcement purposes are served by any delays that arose during the investigation. *Id.* In reviewing complaints about allegedly prolonged detentions, we look at the totality of the circumstances developed during the stop to determine whether there is evidence in the record supporting the trial court's

9

conclusion that reasonable suspicions existed justifying the defendant's detention while the officer investigated matters that extended beyond the initial reason for the stop. *See United States v. Sokolow*, 490 U.S. 1, 8-9 (1989); *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). Although a detention that follows a traffic stop may become unduly prolonged, there is no rigid, bright-line rule governing the time that detentions should take. *Sharpe*, 470 U.S. at 685.

Reasonable suspicion requires more than a hunch, and it exists if the officer has specific articulable facts that, combined with rational inferences from those facts, would lead the officer to reasonably conclude the person is, has been, or soon will be engaged in criminal activity. *State v. Hardin*, 664 S.W.3d 867, 872 (Tex. Crim. App. 2022) (citing *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007)); *Delafuente v. State*, 414 S.W.3d 173, 177 (Tex. Crim. App. 2013). These facts must show unusual activity, some evidence that connects the detainee to the unusual activity, and some indication that the unusual activity is related to a crime. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013) (citing *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011)). Nervousness is a factor that an officer may consider in establishing reasonable suspicion for an investigative detention. *Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012).

An officer may also ask the driver if he possesses any illegal contraband and solicit voluntary consent to search the vehicle. *Strauss*, 121 S.W.3d at 491. If a valid

10

traffic stop evolves into an investigative detention for a drug-related offense, the temporary detention may continue for a reasonable time, and one reasonable method of dispelling the reasonable suspicion that a vehicle contains drugs is to have a trained drug dog perform an "open air" search by walking around the vehicle. *Matthews v. State*, 431 S.W.3d 596, 603 (Tex. Crim. App. 2014). Increasing nervousness, conflicting or implausible information, and other factors can raise a reasonable suspicion to justify prolonging a detention to wait on a canine unit. *Haas v. State*, 172 S.W.3d 42, 54 (Tex. App.—Waco 2005, pet. ref'd); *Neuwirth v. State*, No. 09-18-00248-CR, No. 09-18-00249-CR, 2019 WL 3937997, at *7 (Tex. App.— Beaumont Aug. 21, 2019, no pet.) (mem. op., not designated for publication).

There is no requirement that a canine unit must arrive at the location of the traffic stop within a certain period. *State v. Martinez*, 638 S.W.3d 740, 752 (Tex. App.—Easland 2021, no pet.). That said, the timing of the canine unit's arrival must not be unreasonable under the circumstances. *Id.* Here, the video of the stop shows the canine unit arrived about forty minutes after the initial stop, which was only fourteen minutes after it was requested. Our sister courts have found that detentions awaiting a canine unit that were similar in length to Horace's were not unreasonable under the circumstances. *See Martinez*, 638 S.W.3d at 752 (thirty-eight-minute detention not unreasonable); *Parker v. State*, 297 S.W.3d 803, 812 (Tex. App.— Eastland 2009, pet. ref'd) (seventy-minute detention not unreasonable); *Willis v.*

11

*State*, 192 S.W.3d 585, 589-90, 592 (Tex. App.—Tyler 2006, pet. ref'd) (twenty-nine-minute detention not unreasonable); *Strauss*, 121 S.W.3d at 491-92 (seventy-five-minute detention not unreasonable). Considering the totality of the circumstances developed during the stop and the deceptive behaviors and statements made by Horace, on balance we cannot say that the detention was unreasonable.

The evidence developed in the suppression hearing shows that Horace's detention was supported by reasonable suspicion that criminal activity was afoot. Thus, Miauro's investigatory detention of Horace was lawful. The evidence also shows Miauro was diligent in requesting backup for his safety and a canine unit to confirm or dispel his suspicion that there were narcotics in the vehicle. Based on the totality of the circumstances developed during the stop, we conclude that the evidence in the record supports the trial court's conclusion that Horace's temporary detention was not unduly prolonged and that the length of time between the initial stop and the arrival of the canine unit was not unreasonable under the circumstances.

## CONCLUSION

Having determined that Horace's detention was not unduly prolonged or unreasonable under the circumstances, we conclude the trial court did not err by denying Horace's Motion to Suppress. We overrule Horace's sole issue and affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on July 18, 2025
Opinion Delivered August 27, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.

13